John H. RIDDLE, d/b/a John H. Riddle Contracting Company, Plaintiff-Appellant-Respondent,

v.

The DEAN MACHINERY COMPANY, a Missouri Corporation, Defendant-Appellant-Respondent, and Erickson Construction Company, a Nebraska Corporation, and Parker E. Erickson, Defendants-Appellants, and Seaboard Surety Company, Intervenor-Respondent.

KCD 28356, KCD 28358, KCD 28484.

Missouri Court of Appeals, Kansas City District.

Jan. 30, 1978.

Motion for Rehearing and/or Transfer Denied Feb. 27, 1978.

---

Ralph E. Skoog, Topeka, Kan., William J. Koenigsdorf, Koenigsdorf, Kaplan, Kraft, Fox & Kusnetzky, Kansas City, for Riddle.

Gene A. DeLeve, Thomas A. Schwindt and Berman, DeLeve, Kuchan & Chapman, Kansas City, for Dean.

Frank C. Sabatini, Sabatini, Waggener & Vincent, Topeka, Kan., John R. Caslavka, Shugart, Thomson & Kilroy, Kansas City, for Erickson.

Bernard L. Balkin, Sandler, Balkin, Hellman & Weinstein, P. C., Kansas City, for Seaboard Surety.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Action by plaintiff: in Count I for possession of certain construction equipment including four Caterpillar tractors subject of bills of sale, removed from job sites, and for prevention of threatened removal of additional items of such equipment; in Count II against defendant Dean for possession of a D–8 Caterpillar tractor and acceptance of tender of balance due on its purchase price; in Count III for $113,000 damages for the reasonable market value of all said equipment, and for $400,000 actual and $250,000 punitive damages for interruption and delay of plaintiff's ability to bid on additional contracts on account of the takings; and in Count IV for $500,000 actual and $250,000 punitive damages for libel and slander of plaintiff's credit, reputation, and ability to perform its contracts. Counterclaim by defendant Dean: in Counts I and II for $90,000 in contract retainage due defendant Erickson Company from Riddle and assigned to Dean; in Count III for up to $169,621.72 on an agreement between plaintiff and Erickson Company to pay Dean 70% of net estimates due Erickson Company on a subcontract between plaintiff and Erickson Company; in Count IV for cancellation of the bills of sale to four Caterpillar tractors and declaration that same are owned by Erickson, subject to security interest in Dean; and in Count V for recovery of a dragline and for $12,000 actual and $25,000 punitive damages for wrongful taking of said dragline. Counterclaim by defendant Erickson: in Count I for $110,679.42; in Count II for $169,869.35; in Count III for $147,892.62; in Count IV for $25,000 for wrongful possession of certain items of construction equipment; and in Count V for payment of $25,000 to defendant Dean of unpaid contract retainage. Counterclaim and cross-petition by interve-

nor Seaboard as plaintiff's surety for establishment of a prior lien on all interests of Riddle.

Appeal by Parker E. Erickson, 28356, from the judgment as it held him personally liable to plaintiff Riddle, combined with appeal by Dean, 28358, from those parts of the judgment which found Riddle the owner of and entitled to possession of certain items of the construction equipment, and awarding Riddle damages for loss of profits and for loss of use of said equipment, and with appeal by Riddle, 28484, from those parts of the judgment which cancelled the four bills of sale and declared ownership of subject equipment in Dean, found Dean the owner of the D–8 tractor, and awarded moneys to Dean and Erickson.

Numerous questions are presented which are or go to: the personal liability of Parker E. Erickson; ownership of various items of construction equipment used by Erickson as a subcontractor of Riddle on Corps of Engineers projects; whether Riddle is entitled to damages for loss of profits and loss of use of equipment; whether Riddle is entitled to punitive damages for wrongful taking of equipment; the judgment form; and the accountings for monies between Riddle and Erickson and Riddle and Dean.

Trial commenced on the equity claims in plaintiff's petition. After several days, the parties agreed to try all issues to the court, a trial which consumed some thirty-six days.

The court was requested, and thus required under Rule 73.01.1(b), to draft an opinion containing the grounds for its decision and the method of determining any damages awarded, together with its findings on controverted fact issues specified by counsel. The posture of the appeals indicates the case is best stated through such findings, condensed, paraphrased, and paragraph numbers omitted where appropriate; and it is for review upon the law (of both Kansas and Missouri as the case may be) and the evidence with due regard to be given the opportunity of the trial court to have judged the credibility of the witnesses.

See Rule 73.01.3(a), V.A.M.R., and its construction, *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

Riddle Contracting Company is engaged in the heavy construction business with its principal place of business in Salina, Kansas; William A. Stannard was its general manager with authority to conduct its business and affairs. Erickson Construction Company (Erickson) is a Nebraska corporation authorized to do business in the State of Kansas; Parker E. Erickson is its president. Dean Machinery Company is a Missouri corporation with its principal place of business in Kansas City, Missouri, engaged in the business of selling, leasing, and servicing heavy construction equipment.

Riddle entered into a prime contract with the Corps of Engineers, referred to as C–0151, to construct work known as Jefferson County Road Relocation, Phase I, at Perry, Kansas; Riddle then entered into a subcontract with Erickson, dated June 6, 1967, for certain portions of the work for which Riddle agreed to pay Erickson $606,494.05. Riddle entered into a prime contract with the Corps referred to as C–0017 to construct work known as Interior Roads and Boat Ramp, Phase I, at Perry, Kansas; Riddle then entered into a subcontract with Erickson, dated October 27, 1967, for certain portions of the work for which Riddle agreed to pay Erickson $160,743.50. Riddle entered into a prime contract with the Corps referred to as C–0129 to construct work known as Jefferson County Road Relocation, Phase II, at Perry, Kansas; Riddle then entered into a subcontract with Erickson, dated April 5, 1968, for certain portions of the work for which Riddle agreed to pay Erickson $624,256.60. Riddle entered into a prime contract with the Corps referred to as C–0157 to construct work known as Interior Roads and Boat Ramp, Phase II, at Perry, Kansas; Riddle then entered into a subcontract with Erickson, dated October 6, 1968, for certain portions of the work for which Riddle agreed to pay Erickson $287,275.

Each of said subcontracts was based on agreed unit prices and estimated quantities of work; and also provided in part as follows:

"Partial payments will be made to the Subcontractor each month in an amount equal to 90 percent of the value of work and materials incorporated in the construction and/or materials delivered to the site of the work by the Subcontractor, as estimated by the Architect or Engineer, less the aggregate of previous payments, but such partial payments shall not become due to the Subcontractor until 10 days after the Contractor received payment for such work and materials from the Owner. Upon complete performance of this Subcontract by the Subcontractor and final approval and acceptance of Subcontractor's work and materials by the owner, the Contractor will make final payment to the Subcontractor of the balance due to him under the Subcontract within 10 days after full payment for such work and materials has been received by the Contractor from the Owner."

11. Erickson was a customer of Dean and from time to time purchased equipment, parts and service on credit. On March 21, 1968, Erickson executed an installment note to Dean for $160,798 secured by a mortgage on equipment. Erickson was using the mortgaged equipment to perform its work under the subcontracts with Riddle and needed this equipment to complete its work. The first two installments on the note due April 21 and May 21, 1968, were not paid on time. Riddle agreed to send Dean a check to cover these note payments, interest, and rental on certain equipment. Riddle's check for $18,925.50 was received on June 10, 1968. Erickson was unable to make the payments on the Dean note as they matured. By December 1, 1968, three or more installments of $8,133.50 each were past due and there was a principal balance of $126,265 due. Dean had the option to declare the full $126,265 balance due and payable. Erickson also owed Dean $20,111 on its parts account. Parker Erickson discussed with Dean the possibility of refinancing and extending the

time for payment of these obligations and of buying two tractors which Erickson had been leasing from Dean. Parker Erickson was told that Dean would not grant the requested extension without additional collateral. He told Dean that Erickson had earned retainages in excess of $90,000 on C–0151 and C–0017 and offered to assign that amount of retainage as security for a renewal note. He also represented that Riddle would agree to pay the retainage jointly to Dean and Erickson. Dean prepared and sent the proposed retention agreement to Erickson and advised that if and when it was executed by Erickson and Riddle and returned to Dean, the requested extension would be granted.

On December 18, 1968, James Zipf, a Dean vice-president, called Riddle's general manager, William A. Stannard. In response to his questions, Stannard told Zipf that Erickson's earned retainages on the four Perry subcontracts as of October 31, 1968, amounted to $124,099.55. The value of work completed by Erickson as of October 31, 1968, under each contract, as shown by partial payment estimates prepared by Riddle, as of November 30, 1968, totaled $1,240,995.49.

On or about December 27, 1968, Parker Erickson went to Salina, Kansas, and met with Stannard. He presented the proposed retention agreement prepared by Dean and discussed with him the necessity of this agreement being signed by Riddle in order for Erickson to refinance and extend the time for payment of its obligations to Dean. Stannard noted that under the terms of the proposed agreement, Erickson was only assigning retainages on C–0151 and C–0017. He pointed out to Parker Erickson that the earned retainage on these two contracts as of October 31, 1968, was less than $90,000. Stannard offered to sign the agreement for Riddle if Erickson assigned the retainages on all four Perry subcontracts. Parker Erickson agreed and C–0129 and C–0157 were added to the proposed agreement. The document, Assignment of Receivables, Dean Exhibit 8, signed by Erickson and Riddle and returned to Parker Erickson December 27, 1968, is in the following language:

"The undersigned [Erickson Company by Parker Erickson, president] hereby sells and assigns to Dean-Hanes Machinery Co., * * * funds due the undersigned up to but not to exceed * * * $90,000.00 from the Retained Percentages on Contract[s] 0151, 0017, 0129 & 0157 and authorizes Riddle Contracting Company * * * to pay such funds jointly to Dean-Hanes Machinery Co. and Erickson Construction Co. from any amount due the undersigned. * * * We [Riddle by W. A. Stannard, general manager] hereby accept the above assignment and agree to make all payments not to exceed a total of $90,000.00, as such accounts either are due or become payable, by check payable as hereinbefore specified and forward such payments to Erickson Construction Co., said payments to be made from first moneys payable to above assignor * * *."

The term "retained percentages" as used in Dean Exhibit 8 was understood and agreed by Riddle, Erickson and Dean to mean all sums in excess of 90 percent of the value of work and material for which Erickson was entitled to receive partial payment prior to complete performance of its agreed work, or 10 percent of the value of Erickson's completed work.

Parker Erickson sent Dean Exhibit 8, as signed by Stannard for Riddle, to Dean for the purpose of using it as additional security for a new note. A new note in the amount of $185,407.67, dated December 31, 1968, was prepared by Dean and signed by Parker Erickson for Erickson Construction Company. The note was payable as follows: one payment of $90,000 due April 1, 1969; followed by nine consecutive monthly payments each of $10,000 commencing May 1, 1969, to and including January 1, 1970; followed by one final payment of $5,407.67 due February 1, 1970.

The December 31, 1968, note was executed by Erickson in consideration of the following:

| Balance of Note dated March 21, 1968 | $126,625.32 |
|---|---|
| Interest to December 31, 1968 | 7,702.61 |
| Parts Account through November 25, 1968 | 20,311.31 |
| Filing Fees | 3.00 |
| Balance of Purchase Price of Equipment | 31,125.43 |
| | $185,767.67 |

Riddle agreed that as of December 27, 1968, Erickson had earned retainages of more than $90,000 and represented to Dean that the amount of retainage withheld from Erickson for work done through October 31, 1968, was $124,099.55.

Dean, in reliance upon Dean Exhibit 8 signed by Stannard and Riddle's agreement to pay the first $90,000 of the retainages jointly to Dean and Erickson, accepted the December 31, 1968, note and granted Erickson an extension of time to pay past-due indebtedness amounting to $154,279.24 and extended additional credit amounting to $31,125.43. Stannard knew when he signed Dean Exhibit 8 that Erickson intended to use the document as security to obtain an extension of credit from Dean.

Erickson completely performed all of its work as subcontractor for Riddle under C–0151, C–0017, C–0129, and C–0157 in accordance with the terms of the subcontracts. The Corps of Engineers approved and accepted Erickson's work and materials furnished in constructing improvements under C–0151, C–0017, C–0129, and C–0157. The total value of work completed by Erickson under each subcontract, as shown by final payment estimates prepared by Riddle, is as follows:

| 0151 | September 30, 1970 | 22 | $637,515.20 |
|---|---|---|---|
| 0017 | October 31, 1970 | 16 | 163,405.72 |
| 0129 | October 31, 1970 | 22 | 548,716.54 |
| 0157 | September 30, 1970 | 23 | 266,506.61 |

The parties stipulated that the value of work completed by Erickson under each subcontract, excluding certain agreed extras and disputed claims by Erickson for additional extras and damages, was as follows:

| 0151 | $637,649.85 |
|---|---|
| 0017 | 166,452.52 |
| 0129 | 555,971.54 |
| 0157 | 273,995.71 |

After December 31, 1968, Riddle made payments to Erickson, directly or to third parties for Erickson's benefit, on C–0129 amounting to $380,050.31. After December 31, 1968, Riddle also made payments to Erickson on C–0157, directly or to third parties for Erickson's benefit, amounting to $350,006.93. These payments, together with payments made on these contracts prior to December 31, 1968, exceeded 90 percent of the value of Erickson's work and encumbered and disbursed the full amount of the 10 percent retainage, or final payment in violation of Riddle's agreement with Dean.

Riddle voluntarily entered into new contracts with equipment suppliers after December 31, 1968, and furnished six additional pieces of construction equipment for Erickson's use. Riddle made payments amounting to more than $82,000 on this equipment and deducted them from Erickson's estimates. After December 31, 1968, Riddle also voluntarily advanced $54,275 to pay off mortgages on four pieces of equipment owned by Erickson and subsequently deducted the full amounts advanced from Erickson's estimates. These payments and advances alone exceeded the $90,000 retainage Riddle had agreed to withhold and pay to Dean, and encumbered and disbursed the retainage in violation of Riddle's agreement with Dean.

Riddle received final payment from the Corps of Engineers for his work under each prime contract on the following dates:

| 0151 | September 8, 1970 | $22,237.14 |
|---|---|---|
| 0017 | May 5, 1971 | 3,000.00 |
| 0129 | December 17, 1971 | 11,051.71 |
| 0157 | February 17, 1972 | 14,342.65 |

Riddle received full payment from the Corps of Engineers for Erickson's work and material under each subcontract on or before the date Riddle received final payment for his work under each prime contract.

By June 12, 1969, the date Riddle received a partial payment of $123,759.06 from the Corps of Engineers on C–0151, the amount retained from Riddle's earnings had been reduced to $6,000, or less than four

tenths of one percent of the contractor's total earnings. At that time Riddle was retaining $63,270 or 10 percent of the value of Erickson's completed work. Assuming that all or part of the retainage was attributable to Erickson's work, at least $57,270 of the retainage was due and payable by June 22, 1969.

By June 4, 1970, the date Riddle received a partial payment of $62,209.31 from the Corps of Engineers on C–0129, the amount retained from Riddle's earnings had been reduced to $5,000 or less than one half of one percent of the contractor's total earnings. At that time Riddle was retaining $55,580.29 or 10 percent of the value of Erickson's completed work. Assuming that all or part of the $5,000 retainage was attributable to Erickson's work, at least $50,580.29 of the retainage was due and payable by June 14, 1970.

The December 31, 1968, note has not been paid in full. The unpaid principal balance is $131,451.84 and interest is due and owing from November 1, 1971, at the rate of 9 percent per annum.

Riddle has never paid Dean any part of the retainage on any of the Erickson subcontracts for the Perry jobs, C–0151, C–0017, C–0129, or C–0157.

On various dates between December 31, 1968, and May 20, 1970, Riddle represented to Dean that Erickson was not being paid more than 90 percent of the value of the work and materials incorporated in the work on the four Perry Reservoir subcontracts; that 10 percent of the value of the work performed by Erickson was being retained and would be due and payable to Erickson upon complete performance of the subcontract and final approval and acceptance of Erickson's work by the Corps of Engineers; that the aggregate amount of such retained percentages exceeded and would exceed the sum of $90,000; and that Riddle had not received payment of any retainage from the Corps of Engineers for Erickson's work.

On April 9, 1969, Zipf called Stannard because Dean had not received the $90,000 note payment due April 1, or any part of the retainage on the Perry jobs. Stannard told Zipf that Riddle had not received any of the retainage from the Corps of Engineers but that they expected payment of the retainage on C–0151 by June 1, 1969, and the C–0017 retainage in August or September. Zipf called Stannard on June 2, 1969, and asked if Riddle had received the retainage. Stannard said they had not, but that they expected to receive it shortly.

Dean had continued to furnish parts and service to Erickson on credit after the December 31, 1968, note was executed. As of June 2, 1969, Erickson owed Dean $21,515.99 in addition to the note. Relying upon Stannard's assurances that Erickson would receive its retainages on C–0151 and C–0017 in full by September, Dean accepted a second note from Erickson for $21,519.99, due August 20, 1969. This note was secured by a mortgage on certain of the equipment Erickson was using to perform its work for Riddle on the Perry jobs.

Louis Schumacher, executive vice-president of Dean, met with Stannard and Parker Erickson in early July, 1969. Stannard told Schumacher that Riddle was the successful bidder on a new Corps of Engineers job at Lawrence, Kansas. Stannard said Erickson should earn $200,000 to $300,000 as Riddle's subcontractor and he asked Schumacher to extend credit to Erickson for parts, service, and equipment rental. Schumacher pointed out that Erickson was $130,000 in arrears. Stannard explained that wet spring weather had delayed the work at Perry. He assured Schumacher that the $90,000 retainage was intact and would be forthcoming when received from the Corps of Engineers. Stannard also stated that Erickson had enough work left at Perry to allow it to get current on its $10,000 monthly payments on the December 31, 1968, note. Schumacher refused to extend further credit to Erickson. It was then agreed that Dean would furnish parts and service and rent equipment on Riddle's credit, that these items would be billed to and paid for by Riddle, and that Riddle would charge such payments against Erickson's earnings on the Lawrence job.

Riddle entered into a prime contract with the Corps of Engineers referred to as Contract C–0002 for construction of work known as Flood Protection Work, Section II, North Lawrence Unit, at Lawrence, Kansas. Riddle then entered into a subcontract with Erickson for certain portions of the work for which Riddle agreed to pay Erickson $698,800 based upon agreed unit prices and estimated quantities of work. As with C–0151, C–0017, C–0129, and C–0157, under this subcontract Riddle agreed to pay Erickson partial payments each month in an amount equal to 90 percent of the value of work and materials incorporated in the construction, as estimated by the architect or engineer, less the aggregate or previous payments. Such partial payments were due 10 days after Riddle received payment for such work and materials from the Corps of Engineers.

Although Erickson started work on C–0002 on or about July 26, 1969, the written subcontract between Riddle and Erickson is dated November 1969 and was not executed until after November 10, 1969. On November 10, 1969, Stannard sent the proposed subcontract to Erickson with a letter which said in part:

"We will make your payroll and pay all job-connected expenses and deduct the amounts from your monthly estimates."

49. At Dean's request, a meeting was held in Topeka, Kansas, on or about July 29, 1969. Dean still had not received any part of Erickson's retainages on the Perry jobs. Schumacher first met with Stannard and discussed the past-due installments on Erickson's note. Stannard suggested that Dean take an assignment of Erickson's monthly estimates on the Lawrence job. Parker Erickson and Zipf joined the meeting. Schumacher insisted that something be done about the past-due payments on the December 31, 1968, note and the June 11, 1969, note which would be due August 20, 1969. After further discussion Parker Erickson agreed to assign 70% of Erickson's net estimates on the Lawrence job to Dean; and Schumacher agreed to grant Erickson an extension of time to pay the past-due note installments as soon as Riddle and Erickson confirmed the agreement in writing.

50. Riddle's confirmation of the oral agreement was by letter to Schumacher dated September 25, 1969:

"Parker Erickson has authorized us verbally to make payments of 70% of net estimates due him for work performed on our Lawrence, Kansas project, jointly to Erickson Construction Company and Dean Machinery Company. These payments will be made by us to apply on the Erickson Construction Company indebtedness to your company."

51. Erickson confirmed the oral agreement by letter dated September 27, 1969, to Riddle and a copy to Dean:

"This letter is to authorize Riddle Contracting Company to pay Dean Machinery 70 percent of the net estimates due Erickson Construction Co. until note due Dean Machinery has been paid in full."

The term "net estimates," as used in said assignment and agreement was understood and agreed by Riddle, Erickson and Dean to mean the partial payments due Erickson each month in an amount equal to 90 percent of the value of work and materials incorporated in the construction, less Erickson's payroll and job-connected expenses which Riddle was authorized by Erickson to deduct and pay on its behalf from the partial payments due under said subcontract.

Riddle consented to said assignment and agreed to pay 70 percent of Erickson's net estimates on the Lawrence job to Dean monthly, as partial payments were due to Erickson under the subcontract, in order to induce Dean to grant Erickson an extension of time to pay matured installments on the December 31, 1968, and June 11, 1969, notes.

Riddle's consent to the assignment and agreement to pay 70 percent of the net estimates to Dean was unconditional and there was no agreement to the effect that such payments would not be made unless or

until all obligations of Erickson to Riddle were fully paid.

In reliance upon the oral agreement made by Stannard for Riddle to pay 70 percent of Erickson's net monthly estimates on C–0002 to Dean and upon written confirmation of this agreement, Dean granted Erickson an extension of time to pay the matured installments on the December 31, 1968, note, and the June 11, 1969, note. Dean extended the $140,000 in past-due payments on the December 31, 1968, note by adding $20,000 per month to the monthly payments due in October, November, and December, 1969, and in April, May, June, and July, 1970. Dean also extended the time for payment of the June 11, 1969, note one year to August 20, 1970.

Despite Stannard's representations to Dean that no Perry retainage had been received, Riddle had received the following payments of retainage from the Corps of Engineers prior to Stannard's meetings with Schumacher in July, 1969:

| | | | |
|---|---|---|---|
| 0151 | 20 | $164,647.59 | 6–12–69 |
| 0017 | 15 | 40,418.78 | 6– 9–69 |
| 0129 | 13 | 55,215.21 | 6– 9–69 |

Riddle received additional payments of retainage from the Corps of Engineers after July 29, 1969, as shown by payment estimates approved by Riddle and the Corps of Engineers and Riddle's Cash Receipts Journal as follows:

| | | | |
|---|---|---|---|
| 0017 | 16 | $ 3,000.00 | 8–10–69 |
| 0129 | 14 | 17,584.96 | 9–10–69 |
| 0157 | 18 | 1,746.98 | 4– 6–70 |
| 0157 | 19 | 1,813.07 | 6– 8–70 |
| 0157 | 20 | 4,922.47 | 6–11–70 |
| 0129 | 24 | 39,784.65 | 6– 4–70 |
| 0157 | 21 | 5,940.25 | 7– 1–70 |
| 0157 | 22 | 4,490.90 | 8– 4–70 |
| 0151 | 21 | 6,000.00 | 9– 8–70 |
| 0157 | 23 | 4,989.92 | 9– 8–70 |

Riddle concealed his receipt of these retainage payments from Dean and breached its agreement with Dean by failing to pay Erickson's proportion of the retainage to Dean within 10 days after the payments were received from the Corps of Engineers. By said representations and concealments, Stannard sought to induce Dean to extend the time for payment of the matured installments on said notes, to induce Dean not to accelerate the time for payment or to demand payment of the remaining installments on the December 31, 1968, note, and to induce Dean not to foreclose its security interest in the equipment under said security agreements and not to exercise Dean's legal remedies to enforce payment of Erickson's obligations on said notes.

By reason of the action which Dean took, or refrained from taking, as set out above, Riddle was benefited by the continued use of said equipment by Erickson, and Erickson's continued performance of the work under said subcontracts.

Erickson performed work as subcontractor for Riddle under C–0002 for which it was entitled to partial payments under the terms of the subcontract. Riddle paid Dean $25,000 from net estimates due Erickson on C–0002 but failed to pay Dean 70 percent of the net estimates due and payable to Erickson as partial payments under the terms of said subcontract. The value of work completed by Erickson under C–0002 through December, 1969, based upon agreed unit prices and quantities of work performed as estimated by the Corps of Engineers and accepted by Riddle is as follows:

| | | | |
|---|---|---|---|
| 1 | 8–31–69 | $ 35,000.00 | ($ 2,639.77) |
| 2 | 9–30–69 | 92,778.00 | 11,930.38 |
| 3 | 10–31–69 | 190,018.65 | 49,911.13 |
| 4 | 11–30–69 | 257,287.80 | 62,051.52 |
| 5 | 12–31–69 | 345,716.79 | 83,426.31 |

Amounts reflect 90% of the value of Erickson's completed work less the deductions made by Riddle, as shown by partial estimates prepared by Riddle.

Riddle paid Dean $25,000 to apply on Dean's 70 percent of Erickson's net estimates on C–0002 and deducted the amounts paid as if these payments were for job-connected expenses. These payments, itemized below, were not for job-connected expenses and should not have been deducted in com-

puting the net monthly estimate, 70 percent of which was payable to Dean:

| 2 | 10–31–69 | $ 5,000 |
| 3 | 11–30–69 | 10,000 |
| 4 | 12–31–69 | 10,000 |

Riddle also deducted certain payments to equipment suppliers made during the period ending December 31, 1969, for equipment not used on C–0002. These payments, itemized below, were not job-connected expenses and should not have been deducted in computing the net monthly estimate:

| 1 | 8–31–69 | LeTourneau D Tractor/Water Wagon | $ 602.55 |
| 2 | 9–30–69 | John Deere 400 Tractor/Backhoe [1] | 618.00 |
| 3 | 10–31–69 | No. 12 Motor Grader [2] | 500.00 |
| | | No. 60 Scraper [2] | 515.00 |
| | | No. 120 Motor Grader | 1,000.00 |
| | | John Deere 400 Tractor/Backhoe | 618.00 |
| | | | $2,633.00 |
| 4 | 11–30–69 | LeTourneau D Tractor/Water Wagon | 602.50 |
| | | John Deere 830 Tractor | 412.50 |
| | | No. 12 Motor Grader | 515.00 |
| | | No. 60 Scraper | 500.00 |
| | | | $2,030.00 |
| 5 | 12–31–69 | John Deere 400 Tractor/Backhoe | 618.00 |
| | | 966B Scraper [3] | 2,060.00 |
| | | | $2,678.00 |

[1] Used at Lawrence for one month in June, 1970. See Estimate 12(a) for deductions.

[2] Not used at Lawrence prior to March, 1970.

[3] Used at Lawrence for one month in Fall, 1969. See Estimate 2 for deductions.

The correct net estimate figures for the months through December 1969, upon which the 70 percent payments to Dean should have been calculated and paid, are as follows:

| Estimate No. 1 | August 31, 1969 |
|---|---|
| 90% Less Deductions by Riddle | ($2,639.77) |
| Corrections Current Month | 602.55 |
| Previous Corrections | - - - - - |
| 90% Less Corrected Deductions | ($2,037.22) |
| Previous Payments [1] | - - - - - |
| Net Estimate Due | - - - - - |

| Estimate No. 2 | September 30, 1969 |
|---|---|
| 90% Less Deductions by Riddle | $11,930.98 |
| Corrections Current Month | 618.00 |
| Previous Corrections | 602.55 |
| 90% Less Corrected Deductions | 13,150.93 |
| Previous Payments [1] | - - - - - |
| Net Estimate Due | 13,150.93 |

| Estimate No. 3 | October 31, 1969 |
|---|---|
| 90% Less Deductions by Riddle | $49,911.23 |
| Corrections Current Month | 2,633.00 |
| | 5,000.00 |
| Previous Corrections | 1,220.55 |
| 90% Less Corrected Deductions | 58,764.78 |
| Previous Payments | 13,150.93 |
| Net Estimate Due | 45,613.85 |

| Estimate No. 4 | November 30, 1969 |
|---|---|
| 90% Less Deductions by Riddle | $62,051.52 |
| Corrections Current Month | 2,030.00 |
| | 10,000.00 |
| Previous Corrections | 8,853.55 |
| 90% Less Corrected Deductions | 82,935.07 |
| Previous Payments | 58,764.78 |
| Net Estimate Due | 24,170.29 |

| Estimate No. 5 | December 31, 1969 |
|---|---|
| 90% Less Deductions by Riddle | $ 83,426.31 |
| Corrections Current Month | 2,678.00 |
| | 10,000.00 |
| Previous Corrections | 20,883.55 |
| 90% Less Corrected Deductions | 116,987.86 |
| Previous Payments [1] | 82,935.07 |
| Net Estimate Due | 34,052.79 |

[1] Assumes that the net estimates were paid monthly as they fell due. Actually Riddle paid only $23,000 to Erickson and $25,000 to Dean, or total payments of $48,000.

Partial payments were due ten days after Riddle received payment for Erickson's work from the Corps of Engineers. Riddle received payment for Erickson's work included in the following estimates on these dates:

Contract 0002

| 1 | 8–31–69 | $ 45,000.00 | 9– 5–69 |
| 2 | 9–30–69 | 59,918.40 | 10–14–69 |
| 3 | 10–31–69 | 106,789.66 | 11–13–69 |
| 4 | 11–30–69 | 83,267.48 | 12–12–69 |
| 5 | 12–31–69 | 111,312.82 | 1–26–70 |

The amounts Riddle agreed to pay Dean under the 70 percent net estimate agreement and the dates the payments were due are as follows:

| 2 | 9–30–69 | $ 13,150.93 | $ 9,205.65 | 10–24–69 |
| 3 | 10–31–69 | 45,613.85 | 31,929.69 | 11–23–69 |
| 4 | 11–30–69 | 24,170.29 | 18,919.20 | 12–22–69 |
| 5 | 12–31–69 | 34,052.79 | 23,836.95 | 2– 5–70 |
| | Total due Dean | | $83,891.49 | |
| | Amount paid Dean | | 25,000.00 | |
| | Balance due Dean | | $58,891.49 | |

Certain items were deducted by Riddle from the monthly estimates on C–0002 which Riddle never paid. These items amounted to $47,722.64. They should not have been deducted in arriving at the

amount due Erickson on this job. Included were the following unpaid items:

| 7 | 3–31–70 | Dean Machinery Company | $11,291.96 |
| 11 | 7–31–70 | Dean Machinery Company | 19,457.79 |
| 12 | 8–31–70 | Dean Machinery Company | 3,296.00 |
| 13 | 9–30–70 | Standard Oil Company | 12,170.00 |

The total value of work completed by Erickson on C–0002, as shown by the last partial payment estimate prepared by Riddle on the basis of quantities of work as estimated by the Corps of Engineers and accepted by Riddle is $602,371.18.

The minimum amount Riddle owed Erickson for this work, not including any allowance for additional work Erickson claims to have performed on C–0002, is $46,610.77, computed as follows:

| | | |
|---|---|---|
| Value of Completed Work, per Estimate No. 13, 9–30–70 | | $602,371.18 |
| Total Deductions made by Riddle | $580,483.05 | |
| Less Improper Deductions | 72,722.64 | |
| Corrected Deductions | | 507,760.41 |
| Due Erickson | | $ 94,610.77 |
| Payments—To Erickson | $ 23,000.00 | |
| Payments—To Dean | 25,000.00 | |
| Total Payments | | 48,000.00 |
| Minimum Balance Due | | $ 46,610.77 |

The June 11, 1969, note has not been paid. The unpaid principal balance is $21,519.99 and interest is due and owing from November 6, 1969, at the rate of 8% per annum.

74. Riddle claims title to four pieces of equipment through bills of sale executed by Erickson, as follows:

(a) Bill of sale, dated April 5, 1969, which purports to convey one used Caterpillar Model D8H, S/N 46A4455, with 8S Caterpillar Torsion Bar Dozer, S/N 4282, and Caterpillar Hydraulic Tractor Mounted Ripper, to Riddle.

(b) Bill of sale, dated June 24, 1969, which purports to convey one used Caterpillar D9 Tractor, S/N 34A647, equipped with C Frame, Push Cup 30 CCU, S/N 27B4234, to Riddle.

(c) Bill of sale, dated June 24, 1969, which purports to convey one used Caterpillar No. 631B Tractor, S/N 13G379, equipped with No. 631 Scraper, S/N 11G292, to Riddle.

(d) Bill of sale, dated April 5, 1969, which purports to convey one used Caterpillar Hydraulic Dozer D–7, S/N 17A3093, equipped with DDCCU S/N 9D49087, to Riddle.

At the time of the execution of these bills of sale, Erickson was the owner of the equipment described therein, and said bills of sale, though in the form of conveyances of title, were made for the purpose of securing loans from Riddle to Erickson amounting to $54,270 and were accepted by Riddle as security for payment of said loans, and not otherwise. At the time the bills of sale were executed, Riddle and Erickson orally agreed that Riddle would reconvey the equipment to Erickson when the loans were repaid. The loans made to Erickson by Riddle upon the security of the equipment described in the bills of sale, have been repaid in full. There was no actual and continued change of possession from Erickson to Riddle of the equipment described in the bills of sale. The fair market value of the equipment was substantially greater than the consideration received on the bills of sale. The alleged sale is a financing agreement, rather than a sale. Riddle has failed to show that an actual sale of the equipment was made to Riddle in good faith and upon sufficient consideration.

79. The following pieces of heavy construction equipment were acquired by Riddle Contracting Company from third parties and in the constructive possession and owned by Riddle in September, 1970, as follows:

(a) Caterpillar No. 120 Motor Grader, S/N 14K549.

(b) Caterpillar 966B Loader, S/N 75A259.

(c) Blaw Knox Base Paver, S/N P150–60–56019.

(d) Caterpillar No. 60 Scraper (No serial number).

(e) Caterpillar No. 12 Motor Grader, S/N 8T2228.

(f) Caterpillar DW21 and WATCO Water Wagon, Tractor S/N 69C1355.

The interest Riddle has in the equipment as set forth in Findings of Fact No. 79 was derived through certain contracts to purchase that equipment or lease agreements

with options to purchase, which were subsequently converted to purchases with various equipment vendors.

81. The following items of heavy construction equipment were owned by Riddle and in his possession, subject to a security interest in third parties, in September 1970:

 (a) Northwest No. 6 Dragline, S/N 14273 with drag bucket.

 (b) Galion Rubber Tired Roller, S/N 4826.

 (c) John Deere 830 Diesel Tractor, S/N 5188, equipped with E/W Disc.

 (d) John Deere 450 Backhoe and Loader, S/N 31817.

 (e) LeTourneau Model "D" Tractor, S/N GP8250, equipped with 4,000-gallon Water Tank.

The plaintiff, through William A. Stannard for Riddle Contracting Company and Parker E. Erickson for Erickson Construction Company, orally agreed to arrangements for the use of the equipment described in the Findings of Fact No. 79 above, by Erickson Construction Company for the performance of work under the subcontracts of Erickson for Riddle. It was agreed that Riddle would allow Erickson to use the equipment for such work on Riddle's projects and as compensation for such use, Erickson Construction Company would be charged monthly under the full acquisition cost of the items of equipment as incurred by plaintiff was recovered by plaintiff; that Erickson would not be charged for the use of the equipment on Riddle's work after the acquisition cost had been paid to Riddle; that Riddle would retain title and possession until completion of all the contracts wherein Erickson was the contractor using the equipment on these contracts, and in the event that after all the contracts were completed and an accounting had been had between the parties, and all debts of Erickson to plaintiff had been discharged, Erickson would be assigned the equipment; in the event that upon an accounting, the defendant Erickson Construction Company was indebted to Riddle, then Erickson would have acquired no right or interest in the equipment.

On September 2, 1970, Erickson executed and delivered a written security agreement to Dean, and granted Dean a security interest in the equipment hereafter described as additional security for payment of the December 31, 1968, and June 11, 1969, notes. In consideration of the execution of the security agreement, Dean agreed to extend the time for payment of the notes until March 31, 1970, or until Erickson removed the equipment from the Lawrence jobsite.

84. At the time of the execution of the security agreement Erickson purported to be the owner of the following equipment described in the security agreement:

 (a) Caterpillar No. 120 Motor Grader, S/N 14K549.

 (b) Caterpillar 966B Loader, S/N 75A259.

 (c) Caterpillar D-8 Tractor, S/N 46A4455, equipped with Dozer and Ripper.

 (d) Caterpillar D9 Tractor, S/N 34A-674, equipped with Front and Rear Power Control.

 (e) Caterpillar 631B Tractor, S/N 13G379, equipped with Scraper.

 (f) Northwest No. 6 Dragline, S/N 14273.

 (g) Caterpillar D7-17A Tractor, S/N 17A3093, equipped with Dozer and Cable Control Unit, S/N 9049087.

 (h) Caterpillar No. 12 Motor Grader, S/N 8T2228.

 (i) Caterpillar No. 60 Scraper (No Serial Number).

 (j) Blaw Knox Paver, S/N P150-60-56019.

 (k) Galion Steel Wheel Roller, S/N TC-12G37171.

 (*l*) Galion Rubber Tired Roller, S/N 4826.

 (m) Caterpillar DW 21 and WATCO Water Wagon, tractor S/N 69C1355.

 (n) John Deere 830 Diesel Tractor, S/N 5188, equipped with Disc.

 (*o*) John Deere 450 Backhoe and Loader, S/N 31817.

 (p) LeTourneau Model "D" Tractor, S/N GP8250, equipped with 4,000-gallon Water Tank.

Financing statements were also signed on September 2, 1970, on behalf of Erickson and Dean. Each financing statement recited that it covered the equipment described in the security agreement of the same date. They were filed in the offices of the Secretary of State, Topeka, Kansas, September 2, 1970, and Douglas County Clerk, Omaha, Nebraska, September 4, 1970.

At the time of the execution of the security agreement on September 2, 1970, Erickson had custody and use of all the equipment described in the agreement as set forth in Findings of Fact No. 84. Erickson had custody and physical control of each piece of equipment from the time it was delivered by the supplier, and said equipment was used and operated exclusively by Erickson employees in performing Erickson's work under the subcontracts with Riddle.

88. At the time of the execution of the security agreement on September 2, 1970, Erickson was the owner of the following equipment:

(1) Caterpillar D8 Tractor, S/N 46A4455, equipped with Dozer and Ripper (Findings of Fact No. 74a).

(2) Caterpillar D9 Tractor, S/N 34A–674, equipped with Front and Rear Power Control (Same as Findings of Fact 74b).

(3) Caterpillar 631B Tractor, S/N 13G379, equipped with Scraper (Same as Findings of Fact 74c).

(4) Caterpillar D7–17A Tractor, S/N 17A3093, equipped with Dozer and Cable Control Unit, S/N 9049087 (Same as Findings of Fact 74d).

89. Erickson has custody and physical control of those pieces of equipment referred to as Findings of Fact No. 84(a), (b), (f), (h), (i), (j), (k), (*l*), (m), (n), (o), and (p) from the time it was delivered by the supplier and said equipment was used and operated exclusively by Erickson employees in performing Erickson's work under the subcontracts with Riddle. Erickson mistakenly believed itself to be the owner of the above said equipment at the time of the execution of the security agreement on September 2,

1970. Erickson mistakenly represented to Dean that Erickson was, in fact, the owner of the above said equipment, which, in fact, was owned by Riddle at the time financing statements were signed on September 2, 1970.

90. The following equipment owned by Dean was furnished for Erickson's use and benefit under lease agreements between Dean as lessor and Riddle as lessee:

1 used Caterpillar D8H Tractor, S/N 46A12051 with Caterpillar 8S Dozer, S/N 29E7579, and Caterpillar 183 Hydraulic Control, S/N 27H–1062.

1 American AD 120 Roller, S/N 52885.

1 used Caterpillar No. 80 Scraper, S/N 5W–479.

Riddle admits that Dean is the owner of said roller and scraper and makes no claim to ownership or possession of this equipment.

The D8H Tractor with Dozer and Hydraulic Control was furnished under a written equipment rental agreement entered into between Riddle and Dean which provides:

"Title to the equipment shall at all times vest in the lessor unless transferred to the lessee through sales."

The equipment rental agreement further provides:

"This equipment rental agreement constitutes the entire agreement between the parties, and parties shall not be bound by any other agreements or understandings either express or implied, verbal or written, relating to the subject matter hereof, or as to the condition of the above equipment or to the purpose for which it is being rented, which have not been fully set forth herein."

The equipment rental agreement was intended to be a full and complete expression of the terms of the agreement between Riddle and Dean with respect to the D8H Tractor. No sale of the D8H Tractor was subsequently made by Dean to Riddle. Unlike the leases entered into with other suppliers, the equipment rental agreement between Dean and Riddle for the D8H Trac-

tor did not contain any purchase option or grant Riddle any right or option to purchase this equipment. The equipment rental agreement on the D8H Tractor was a true rental agreement. It was not a sale or contract of sale and this transaction was not intended to create a security interest in said equipment. Riddle failed to pay the rental of the D8H Tractor as agreed, and any right to possession of Riddle or Erickson, or any other interest in said leased equipment, ceased upon the lessee's default in payment. Dean had the right to possession of this equipment after default in payment of the rental due March 17, 1970. Dean did not orally agree to sell the D8H Tractor to Riddle. There was no writing signed by any authorized agent of Dean sufficient to indicate that a contract for sale had been made between Dean and Riddle or setting out the price or any other terms of any oral sales agreement. At all times after September 17, 1970, Dean was entitled to possession of all the equipment described in Findings of Fact No. 88.

102. The financing statements filed on September 2, 1970, and September 4, 1970, named Dean as secured party and Erickson as debtor. Riddle is not named as debtor or referred to in either financing statement. At the time the financing statements were filed of record, Erickson was the owner of all the equipment referred to in Findings of Fact No. 88 and had possession and control of each piece of equipment referred to in Findings of Fact No. 89. Before the financing statements were filed of record, Erickson had granted Dean a security interest in the described equipment. The statements contained in the financing statements and all reasonable inferences which could be drawn therefrom were true to the best of Dean's knowledge at the time of said filing.

A meeting was held in Topeka, Kansas, on September 1, 1970, in the office of Frank Sabatini, Erickson's attorney. The purpose of the meeting was to prepare a two-party security agreement to be executed by Dean and Erickson. Erickson, Sabatini, Zipf, Ray Weatherby, vice-president and treasurer of Dean, and Tom Watson, an attorney repre-senting Dean, were present. Changes were made in the original draft by Mr. Sabatini and Mr. Erickson which were accepted by the Dean representatives and their attorney. Because it was late by the time the agreement was in acceptable form, it was agreed that Dean would have the agreement retyped in Kansas City, and that they would take it to Erickson the next day for execution. At the meeting in Mr. Sabatini's office they discussed the way certain equipment had been purchased or rented for Erickson in Riddle's name. The Dean representatives were assured that the payments for the equipment had been deducted from Erickson's estimate and Erickson had an equity in the equipment to the extent of the deductions for such payments. Mr. Sabatini expressed his opinion that Erickson had every right to execute the security agreement. Mr. Sabatini also told them that there were no financing statements from Erickson to Riddle. Dean representatives already knew this because they had searched the records in the Secretary of State's office in Topeka and in Omaha and had not found any financing statements on file naming Erickson as debtor and Riddle as secured party. Mr. Weatherby, Mr. Zipf, and Mr. Watson believed in good faith that Erickson had sufficient interest in the equipment to execute the security agreement. Parker Erickson also believed in good faith that Erickson had sufficient interest in the equipment to execute the security agreement. Parker Erickson also believed in good faith that Erickson Construction Company was the owner and had the right to mortgage its interest in the equipment to Dean at the time he signed the security agreement and financing statements. Dean filed the financing statements and asserted its claim to a security interest equipment in question in good faith and without malicious intent and in doing so Dean acted in reliance upon the advice of counsel and under the honest and reasonable belief that it had a valid security interest in said property.

113. As of September of 1970, with regard to C–0151, Riddle Contracting Compa-

ny had paid the sum of $678,814.63 to or on behalf of Erickson Construction Company and Erickson had earned the sum of $637,649.85 for subcontract items performed plus $7,105.19 earned for miscellaneous items, all as stipulated by the parties:

(a) That on Item No. 2 of additional work on Erickson Construction Company's Exhibit No. 16 Change Order No. 1, the deletion of 120,000 cubic yards, John Riddle should have filed claim for Erickson's profit on this item as testified by Corps of Engineers and is allowed in the amount of $6,500.

(b) That on Items 3 and 4, Erickson Construction Company performed extra work because of the size of rock being supplied and in accordance with Riddle's agreement to pay for the extra work, the claims are allowed in the amounts of $10,459.80 and $7,960.50 respectively.

(c) That on Item 40, John Riddle failed to pursue with the Corps of Engineers, the reduced quantities of Item 2 with the subcontract; that Erickson Construction Company did move the additional quantities, and said claim is allowed in the amount of $47,539.36.

(d) That items of additional work on Erickson Construction Company's Exhibit No. 16, Nos. 14, 35, 36, 37, 38, 39, 41, and 42 are not allowed on the grounds that defendant Erickson Construction Company has failed to show by a preponderance of the evidence that said claims should be allowed.

(e) The court further finds that there is a balance due Erickson Construction Company in the amount of $19,979.77 on C–0151.

114. As of September of 1970, with regard to C–0017, Riddle Contracting Company has paid the sum of $151,045.42 to or on behalf of Erickson Construction Company, and Erickson has earned the sum of $166,452.52 for subcontract items performed plus $4,181.48 earned for miscellaneous items all as stipulated by the parties:

(a) Defendant Erickson Construction Company has failed to show by a preponderance of the evidence that items of additional work on Erickson Construction Company's Exhibit No. 30, Items Nos. 1, 11 through 16, 17, and 18 should be allowed.

(b) The court further finds that there is a balance due Erickson Construction Company in the amount of $19,588.38 on C–0017.

115. As of September 1970, with regard to C–0129, Riddle Contracting Company had paid the sum of $726,097.99 to or on behalf of Erickson Construction Company and Erickson had earned the sum of $555,971.54 for subcontract items performed plus $14,686.42 for miscellaneous items as stipulated by the parties:

(a) That defendant Erickson Construction Company has failed to show by a preponderance of the evidence that items of additional work on Erickson Construction Company's Exhibit No. 36, Item Nos. 1, 2 through 10, 13, 14, 19, 20, 30, and 31 should not be allowed.

(b) The court finds that there is a balance due Riddle Contracting Company in the amount of $155,440.03 by Erickson Construction Company on C–0129.

116. As of September, 1970, with regard to C–0157, Riddle Contracting Company had paid the sum of $401,355.97 to or on behalf of Erickson Construction Company and Erickson had earned the sum of $273,995.71 for subcontract items performed plus $8,045.95 for miscellaneous items as stipulated by the parties:

(a) Defendant Erickson Construction Company has failed to prove by a preponderance of the evidence that items of additional work on Erickson Construction Company's Exhibit No. 33, Items Nos. 9, 10, and 11 should be allowed.

(b) The court further finds that there is a balance due Riddle Contracting Company in the amount of $119,314.31 on C–0157.

117. As of September 18, 1970, with regard to C–0002, Riddle Contracting Company had paid to or on behalf of Erickson Construction Company or obligated itself to pay for the benefit of Erickson Construction Company, the sum of $555,760.41. The total quantities of subcontract items substantially performed by Erickson Construction Company on said date was the subcontract dollar amount for completed items of

$602,370.18. Riddle Contracting Company was required to perform work subsidiary to the item quantities substantially completed by Erickson Construction Company at a cost of $40,000. Riddle Contracting Company was and is indebted to Erickson Construction Company in the principal amount of $6,609.77 on C–0002.

118. In summary of Findings 113 through 117, Erickson Construction Company is indebted to Riddle Contracting Company in the principal sum of $210,156.12 by reason of the subcontracts described as of September 18, 1970, no part of which has been paid.

119. Riddle Contracting Company was, in September, 1970, on or about the time of the taking of the equipment by Dean Machinery Company, an established business engaged regularly in work with public bodies requiring the giving of bonds and particularly with the United States of America, giving bonds under the Miller Act, U.S.C. 40, Section 270a.

120. The defendants at the time of the taking of the plaintiff's property knew or should have known that their acts would prevent or interrupt the plaintiff in obtaining bonds for further work and prevent plaintiff from proceeding with further work, and thus as a consequence of the taking, deprived plaintiff of prospective profits in this business. Due to the act of the defendants in removing the plaintiff's property, plaintiff's collateral used for securing bonds was reduced and plaintiff was unable to secure bonds for new jobs.

121. But for the acts of taking by the defendants, it is reasonably certain that the plaintiff would have realized additional profits between the time of the taking by the defendants and the time of trial in the amount of $75,000.

122. In order to perform work to be done on C–0002 and subsequent work prior to trial to replace the loss of use of equipment wrongfully taken by the defendants, the plaintiff was forced to expend sums of money to procure equipment to perform said work. The value of the use of such equipment to replace the lost use of the wrongfully taken equipment is in the amount of $75,000.

123. The actual value of the equipment owned by the plaintiff taken by the defendants acting together in September 1970 was as follows at the time of taking:

79(a). Caterpillar No. 120 Motor Grader, S/N 14K549, $11,700.

79(b). Caterpillar 966B Loader, S/N 75A259, $16,000.

79(c). Blaw Knox Base Paver, S/N P150–60–56019, $3,000.

79(d). Caterpillar No. 60 Scraper (no Serial Number), $1,500.

79(e). Caterpillar No. 12 Motor Grader, S/N 8T2228, $1,500. (Brought to Dean's lot in August 1971.)

79(f). Caterpillar DW 21 and WATCO Water Wagon, Tractor, S/N 69C1355, $12,500. (Brought to Dean's lot in August 1971.)

The total value of the above said equipment is in the amount of $46,200.

124. The defendants, by making and filing the financing statements referred to in Finding No. 102, did not intend to file same as a part of a scheme to wrongfully deprive plaintiff of the possession and ownership of the equipment described herein and defendants did not maliciously disregard the rights and interest of the plaintiff, his credit, and business reputation and ability to perform existing contracts, or impair plaintiff's future opportunities to carry on a successful business.

125. The defendants, by transporting the equipment of plaintiff referred to in Findings Nos. 79 and 81, acted mistakenly and did not maliciously disregard the rights and interest of the plaintiff to said equipment. Defendant Dean acted only after obtaining advice of counsel.

126. The issues pertaining to sums of money expended by Riddle on behalf of Erickson, and paid by Riddle to Erickson, for work performed by Erickson on C–0151 (Finding of Fact 113), C–0017 (Finding of Fact 114), C–0129 (Finding of Fact 115), C–0157 (Finding of Fact 116), and C–0002

(Finding of Fact 117) were not raised by the pleadings herein, but were tried by implied consent of the parties, and are to be treated as if raised in the pleadings.

The court ordered, adjudged and decreed:

A. Judgment in favor of plaintiff against defendants jointly and severally on Counts I and III of his amended petition in that the defendants and each of them are enjoined to return to the possession of the plaintiff at his principal place of business in Salina, Kansas, the construction equipment described in Finding 123; and judgment against the defendants, jointly and severally, in the sum of $75,000 as damages for loss of profits, and $75,000 as damages for loss of use of the equipment owned by the plaintiff, with interest from the date of judgment at the rate of 6% per annum; or in the alternative, under Count III, at the option of plaintiff, the defendants are required and ordered to pay to the plaintiff, the value ($46,200) of said equipment as set forth in Finding 123, plus interest at the rate of 8% per annum.

Plaintiff is ordered to file a written election to recover possession of the above said equipment in lieu of payment of the assessed values pursuant to Finding 123, as a condition precedent to any obligation on the part of the defendants to return the equipment to the plaintiff.

B. Judgment against the plaintiff and for the defendants on Counts II and IV of his petition.

C. Judgment for the plaintiff and against defendant Erickson Construction Company, pursuant to Finding 126, in the sum of $274,754.34.

D. Judgment in favor of the defendant, Dean, against the plaintiff on Counts I and II of Dean's amended counterclaim in the amount of $90,000 with interest on $67,-308.80 from June 22, 1969, and on $22,691.20 from June 14, 1970, at the rate of 6% per annum.

E. Judgment for Dean, against the plaintiff, on Count III of Dean's amended counterclaim in the amount of $58,891.49 with interest on $16,135.34 from November 23, 1969, $18,919.20 from December 22, 1969, and $34,836.95 from February 5, 1970, at the rate of 6% per annum.

F. Judgment for defendant, Erickson Construction Company, against plaintiff on Erickson's counterclaim on Count I in the sum of $19,588.38, on Count II in the sum of $38,400.07, and on Count III in the sum of $6,609.77, totaling $64,598.22.

G. Judgment against Erickson and for the plaintiff on Counts IV and V of Erickson's counterclaim.

H. Judgment for intervenor Seaboard Surety Company on Count I of the intervenor's counterclaim and cross-petition such that intervenor has an equitable lien upon all the equipment described in Findings 79 and 81, prior in right to all other parties to this action to the extent of loss, costs, and expense incurred by it and the liability determined against it by reason of execution of the bonds made and given by Seaboard Surety Company to the United States of America on behalf of the plaintiff as principal with reference to C–0151, C–0017, C–0129, C–0157, and C–0002; in that such equitable lien shall constitute a prior judgment in favor of Seaboard Surety Company and against the plaintiff for any judgment in favor of the plaintiff and against the defendants with regard to the taking or detention of said equipment or damages awarded by reason of such taking or detention.

I. "In summation, judgment is entered in favor of the plaintiff against the Defendant Erickson Construction in the sum of Two Hundred Ten Thousand One Hundred and Fifty-Six Dollars and Twelve Cents ($210,156.12).

"Judgment is entered in favor of the plaintiff against the defendants, jointly and severally, in the sum of One Hundred and Fifty Thousand Dollars ($150,000.00).

"Judgment is entered in favor of the Defendant Dean against the plaintiff in the amount of Two Hundred and Five Thousand Seven Hundred Twenty-Four Dollars and Ninety-Eight Cents ($205,724.98), which sum includes interest to date.

"Further, it is ordered that if the plaintiff elects to recover the value [$46,200] of the equipment pursuant to Finding * * 123, the judgment for Defendant Dean against the plaintiff shall be reduced by the value of said equipment as set forth in Finding * * * 123, and that title to said equipment shall vest in Erickson, subject to Dean's perfected security interest."

### Personal Liability of Parker E. Erickson

Appellant Parker E. Erickson contends the judgment in favor of plaintiff Riddle as against "defendants, jointly and severally" is erroneous insofar as it may be a personal judgment against him because there is no evidence to support such holding.

■ The record shows with but one exception that the actions of defendant Parker E. Erickson were at all times as president of defendant Erickson Construction Company. The exception is Mr. Erickson's appearance as a guarantor on indebtedness of the Erickson Company to Dean Machinery Company, and such is not the subject of Riddle's claims for relief. Mr. Erickson also drove some of the machines in question, mortgaged to Dean, to Dean's yard in Kansas City where Dean exercised possession over them to the exclusion of Riddle. Such act did not, nor does it now, require a finding that Mr. Erickson was acting wrongfully. To the contrary, the record shows, as found by the court and not here disputed, "Parker Erickson * * * believed in good faith that Erickson Construction Company was the owner and had the right to mortgage its interest in the equipment to Dean * * *." Accordingly, the judgment as against Parker E. Erickson personally must be reversed.

### Ownership of Construction Equipment

Appellant Dean contends the court erred in failing to find that Erickson was the owner (as opposed and to the exclusion of Riddle) of the construction equipment described in Findings 79 and 81, and in awarding Riddle possession of the equipment described in Finding 123, and, in the alternative, for value of said equipment (123) because: I. Said equipment was purchased with Erickson's money or with money loaned to Erickson by Riddle and paid by Riddle to suppliers for Erickson's benefit whereby Erickson became the beneficial owner of the equipment under a purchase money resulting trust; II. Dean has a valid perfected security interest in said equipment and Riddle's interest was at most a subordinate unperfected security interest; III. Said equipment, at all material times, was owned by Erickson and Dean had the right to possession; IV. Riddle failed to show he was entitled to immediate and exclusive possession of said equipment when his action was commenced.

Appellant Riddle contends the court erred in determining that Erickson was the owner of the four tractors described in Finding 74, and in cancelling the bills of sale between Erickson and Riddle relating to said equipment, because: (a) Use and "custody" of said equipment by Erickson was not possession against Riddle as to require him to file a financing statement to perfect his claim of ownership; (b) there was no presumption of ownership in Erickson from its use and possession of said equipment after execution of the bills of sale in that Riddle shared a mixed or joint possession of said equipment; (c) the evidence does not show that the fair market value of said equipment was greater than the considerations recited in and renewed upon execution of the bills of sale; (d) the agreement to reconvey said equipment upon payment of then existing loans is inconsistent with findings respecting other equipment in question; (e) the loans are not shown to have been paid.

Appellant Riddle also contends the court erred in determining that Dean was the owner and lessor to Riddle of the D8H Tractor described in Finding 90 because: No consideration was given to the cover letter to the D8 rental agreement, and Dean's admission of a security interest in said D8 is irreconcilable with the determination that the D8 was owned by Dean and rented to Riddle as opposed to a lease-purchase agreement for which Riddle would tender the balance due on the purchase price.

Mr. Stannard on behalf of Riddle, Mr. Weatherby, Mr. Zipf and Mr. Schumacher on behalf of Dean, and Mr. Erickson, as well as many others including accountants and bookkeepers, testified at length to the facts of the parties' relationships, their agreements, and their intentions with respect to the transactions involving the equipment in question and its use, possession and ownership. Also in evidence are the pertinent bills of sale, books, records, accounts, purchase and lease documents, mortgages and notes, financing statements and security agreements, etc., pertaining to said equipment.

■ The court's findings demonstrate consideration of all such evidence, and that it presents conflicts with respect to the fact issues of ownership of the various pieces of equipment in question. Resolution of such conflicts is peculiarly within the province of the trial court under Rule 73.01, *Kim Manufacturing, Inc. v. Superior Metal Treating, Inc.*, 537 S.W.2d 424, 428[3] (Mo.App.1976); and it may not be said on this record that the findings thus made are erroneous as a matter of law for any of the reasons suggested by Dean and Riddle.

Accordingly, the judgment with respect to ownership of the construction equipment must be affirmed.

### Loss of Profits Damages

■ Appellant Dean contends the court erred in awarding Riddle damages for loss of profits (Findings 119–121) with respect to the equipment described in Finding 123 because: A. Same is not proper for wrongful taking or detention of property; B. If proper, plaintiff could and should have mitigated any such damages; C. Plaintiff could have avoided same by filing a replevin bond; D. The taking and detention of plaintiff's equipment was not the proximate or legal cause of any loss of profits, expected profits were too remote, speculative and uncertain to support such an award, and there was no evidence to warrant recovery of such damages; E. Same were excessive.

22 Am.Jur.2d, Damages § 177, states the general rule:

" * * * that prospective profits from an established business, prevented or interrupted by the tortious conduct of the defendant, are recoverable when it is proved (1) that it is reasonably certain that such profits would have been realized except for the tort, and (2) that the lost profits can be ascertained and measured, from the evidence introduced, with reasonable certainty. * * * the damages may not be left to mere speculation or conjecture."

" 'Profits' in the ordinary acceptation of the law, is the benefit or advantage remaining after all costs, charges, and expenses have been deducted from the income, because, until then, and while anything remains uncertain, it is impossible to say whether there has been a profit." *Morrow v. Missouri Pac. Ry. Co.*, 140 Mo.App. 200, 123 S.W. 1034 (1910). Expected profits are uncertain and remote, and contingent upon changing circumstances; and can be recovered only when made reasonably certain by proof of actual facts which present data for a rational estimate of their worth. *Central Coal & Coke Co. v. Hartman*, 111 F. 96 (8th Cir. 1901).

■ The difficulty in the judgment awarding Riddle $75,000 for loss of profits lies not with the matters determined in Finding 120, but in the failure of evidence, free of speculation and conjecture, showing probable profits in any sum.

This is not a case where loss of profits are sought for breach of an existing contract or for immediate loss to an established business, e. g., *Avery v. City of Lyons*, 183 Kan. 611, 331 P.2d 906 (1958), where owners of a building housing their mercantile business were awarded damages for loss of profits from interruption of their going business and loss of stock in trade resulting from an explosion and fire caused by presence of natural gas under the building which had leaked from the city's defective gas mains.

The contract for yet another Corps of Engineers project upon which Riddle claims he would have earned profits upwards of $250,000, based on prior profit experience,

was one upon which he became the apparent low bidder; however, it was not in existence at the time of the conduct found as the cause of loss and was not let to the successful bidder until more than a year later. It cannot be said with certainty that Riddle would have been awarded the contract by the Corps, or that past experience with variables such as weather and site conditions, both of which are risks in the heavy construction business, would prevail on future contracts upon which he might be the successful bidder.

Accordingly, the judgment awarding Riddle $75,000 as damages for loss of profits must be reversed.

### Loss of Use Damages

Appellant Dean contends the court erred in awarding Riddle damages for loss of use on Contract C–0002 (Finding 122) with respect to the equipment described in Finding 123 because: A. There was no competent evidence of the use value of the equipment; B. The amount assessed is grossly excessive.

■ "Generally the loss of use of property is a compensable element of damages in the state of Kansas. The ownership of an item of property carries with it the right to use, or to control the use of, that item of property. Therefore, where one has been wrongfully deprived of the use of an item of property there has been a loss of one of the valuable rights or interests in property—the right to use the property. * * * The general rule * * * is that damages for the wrongful deprivation of the use of specific property are to be measured by its rental value." *J. A. Tobin Construction Co. v. Holtzman*, 207 Kan. 525, 485 P.2d 1276, 1281 (1971). See also *Anderson v. Rexroad*, 180 Kan. 505, 306 P.2d 137 (1957); *Avery v. City of Lyons*, supra; 22 Am.Jur.2d, Damages § 155.

Riddle had evidence to show that the Blaw Knox Base Paver, item (c), Finding 123, had a rental value of $1,500 per month and that it "could have been rented to others at least four months in the two consecutive construction seasons" before trial, a loss of rentals of $12,000.

Riddle had evidence also to show that 10 percent of the value of construction equipment is a reasonable standard in the industry for determining short-term rental charges. This standard was not disputed by Dean, an expert in the heavy equipment rental business. Application of this standard to the value determined by the court on conflicting evidence of the equipment described in Finding 123, less the paver, results, in additional loss of rentals of $4,320, and a total loss of rentals of $16,320.

■ The court admitted, as demonstrated in Finding 123, evidence of the value of a D6 Dozer, a 977 Loader, a No. 99 Motor Grader, and a D8 Dozer with No. 80 Scraper "obtained and acquired to do the work originally planned to be performed by the wrongfully taken equipment" on C–0002, and evidence of the rental value of other substitute equipment. The finding is erroneous in that respect because the cost of replacement equipment is no evidence of the value of the loss of use of the equipment it was acquired to replace. *Burns, Inc. v. Trantham*, 305 S.W.2d 66, 71 (Mo. App.1957); *Ocala Foundry & Machine Works v. Lester*, 49 Fla. 199, 38 So. 51 (1905).

■ As thus reduced, the damages for loss of use of equipment are no longer excessive because they bear reasonable relationship to the value of the property detained. *Armstrong & Latta v. City of Philadelphia*, 249 Pa. 39, 94 A. 455 (1915).

Accordingly, the judgment awarding Riddle $75,000 damages for loss of use must be reversed and remanded with direction to enter a new judgment for loss of use in sum $16,320.

### Punitive Damages

Appellant Riddle contends the court abused its discretion in finding that defendants, in taking certain equipment to Dean's lot in Kansas City, were acting under a mistake of fact and therefore failing to assess punitive damages.

Finding 125 demonstrates that the court considered the question of punitive damages and exercised its discretion against imposition of same.

■ Such damages do not lie as a matter of right and whether same are awarded lies wholly within the discretion of the trial court. *DeBow v. Higgins*, 425 S.W.2d 135 (Mo.1968); *Bellerive Country Club v. McVey*, 365 Mo. 477, 284 S.W.2d 492 (banc 1955); *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473 (Mo.1960). Appellant's authorities, e. g., *Stalker v. Drake*, 91 Kan. 142, 136 P. 912, 913 (1913), and cases there cited, do not compel an award of punitive damages; they simply uphold awards of punitive damages on the situations presented.

### The Judgment Form

Appellant Dean complains of the failure of the court to require plaintiff to elect between his claim for possession of equipment and damages for detention and his claim for value of the equipment and damages for taking, and in entering judgment in form granting plaintiff the alternative to recover the equipment on its value.

■ In his Count I Riddle sought recovery and delivery of possession of certain items of construction equipment withheld from him by the acts of Dean and Erickson. In Count III he sought recovery of the value of the equipment and damages for its loss of use. The court found plaintiff to be the owner of six items of the equipment sought by Count I and assessed their values in total sum $46,200 (Finding 123). The court, pursuant to such finding, entered judgment (A) for plaintiff for possession of such equipment; or, in the alternative, for the value of same fixed at $46,200.

This portion of the judgment comports with Rule 99.14 which contemplates that upon failure of the defense, the verdict and judgment in a suit for recovery of possession of personal property (replevin) (a) will

find and declare the prevailing party's right of possession, (b) determine and assess value of the property at time of trial,[2] thus to afford the prevailing party an election to take the property or its assessed value, and (c) determine and assess damages, if any, for taking and detention. *M.F.A. Co-op Ass'n of Mansfield v. Murray*, 365 S.W.2d 279, 289[16] (Mo.App.1963).

Appellant Dean complains also of the entry of separate money judgments for Riddle and Dean instead of an offset of damages assessed against each and entry of a single judgment for Dean and against Riddle for the excess.

■ In cases on claims and counterclaims, generally there would be separate findings on plaintiff's claim and on defendant's counterclaim embodied in a single judgment which, in usual practice, recites the findings and concludes with a judgment for the party in whose favor the greater finding was made, and for the sum which represents the excess of his finding over that of his adversary. *City of St. Louis v. Clark*, 35 S.W.2d 986 (Mo.App.1931). See also *Rehm v. Fishman*, 395 S.W.2d 251 (Mo. App.1965).

■ The foregoing general rule cannot be applied in this case however, because, rather than the two-party relationship governed by the general rule, this case presents a three-party situation. In this case the intervenor, Seaboard, has established entitlement to equitable liens against the interests of plaintiff Riddle; and the prior equitable lien of a third party against a plaintiff is not subject to a defendant's setoff against the plaintiff. *United States Fidelity & Guaranty Co. v. Levy*, 77 F.2d 972 (5th Cir. 1935).

■ Appellant Dean contends also that the court erred in granting Seaboard an equitable lien prior in right to Dean's rights because: A. No equitable lien was created in Riddle's equipment (Findings 79 and 81)

---

2. The court, in its provision for election, used the same figure as that found as the value of the equipment at the time of taking. Ordinarily, such value would be assessed as of the time

of trial; however, under the wide range of evidence on values in this case, the court's figure of $46,200 is here found acceptable for this purpose.

by operation of law solely by reason of the surety relationship, and no such lien could attach absent evidence of loss by Seaboard for which it is entitled to be indemnified by Riddle. B. There was no evidence that Riddle granted Seaboard any contractual lien on equipment or claim for damages, and the lien by its terms extends only to equipment and not to any claim or judgment for damages for detention of the equipment or its value.

■ Seaboard, in its petition, alleged execution of bonds of surety and indemnity on behalf of Riddle, execution of applications containing assignments by Riddle, and existence of claims against Seaboard, which, if established, would be valid obligations for which Seaboard would be entitled to indemnity from Riddle. Riddle admitted such allegations, thus resolving the validity of the assignments in favor of Seaboard. Dean is not in position to complain of such assignments when so acknowledged by Riddle. The rights of Seaboard are limited to the rights of Riddle against Dean, and Dean is not faced with multiple exposure for a single claim. A surety need not pay claims before asserting its right of exoneration against its principal in equity. *Morley Const. Co. v. Maryland Casualty Co.*, 90 F.2d 976 (8th Cir. 1937). In these circumstances, Seaboard is entitled to a lien on any judgment in favor of Riddle.

Appellant Dean asserts the court exceeded its authority in its judgment (A) in favor of Riddle by requiring delivery of the equipment to Salina, Kansas.

■ The property was, prior to its delivery to Dean's lot in Kansas City, Missouri, on a job site at Lawrence, Kansas, and the replevin judgment was sought and obtained in Kansas City. Rule 99 requires the property to be delivered to the sheriff prior to the successful plaintiff's election to take same or its value. The sheriff would necessarily take possession of the property at the place of its detention, in this case Jackson County, Missouri.

The record does not present any basis for such order and it should be deleted from the judgment.

### The Accountings

#### A. Between Riddle and Erickson

■ Appellant Riddle contends the court erred in allowing as part of the judgment (F) in favor of Erickson, the sum of $47,539.36 (Finding 113) because: Erickson failed to perform the condition precedent of providing information to Riddle to enable Riddle to pursue the claim with the Corps; the court does not set forth the facts found to support the finding and the weight of the evidence does not sustain the award; the court refused to apply the contract standard of measurement and used a standard never agreed upon nor applicable between the parties to the work.

Finding 113, particularly 113(c), arises from the following circumstances: On C–0151, Erickson claimed he excavated 1,862,-000 cubic yards of earth; the Corps established the final quantity for payment at 1,667,108 cubic yards. Erickson, pursuant to the appeal process in Corps contracts, submitted a letter to Riddle setting forth facts in support of his claim and to show the Corps' calculations incorrect. Riddle, pursuant to the appeal process, wrote to the Corps and requested consideration of the claim. Additional measurements were made by Riddle and the Corps after which a meeting was held attended by representatives of Erickson, Riddle, and the Corps. Two days later the Corps wrote Riddle, copy to Erickson, in denial of the claim. Although a number of additional steps existed in the Corps appeal process, Riddle did nothing in furtherance of the claim, and the process did not provide for direct appeal by the subcontractor. Riddle would excuse this failure on the ground Erickson provided no further information in support of the claim. Riddle also adduced evidence on the various ways by which earth quantities are measured, including the contract provision for the Average End Area Method.

The foregoing is distilled from extensive conflicting evidence on the issue, and it demonstrates the existence of what appellant Riddle calls "a controversy." It also

shows a basis for the trial court's finding which, under Rule 73.01, must be affirmed.

### B. Between Riddle and Dean

Appellant Riddle contends the court erred in failing to offset and enter judgment in favor of Riddle and against Erickson for the $205,724.98 which the court determined that Riddle must pay Dean on behalf of Erickson; that same was a windfall judgment to creditor Dean against Riddle for amounts in excess of the amounts owed Dean by Erickson, when Riddle was obligated to Dean only as security for the Erickson debt; that the court erred in finding that the $90,000 assignment of receivables was an absolute assignment, asserting that the court failed to construe ambiguities in the assignment against Dean, the preparer, in favor of Riddle, the party to be held.

Appellant Riddle contends the court erred also with respect to the 70 percent net estimate claim in failing to consider the contract definition of "Net Estimates," and in lieu thereof determining an "understanding"; in finding the letters of September, 1969, were merely written ratifications of a prior oral agreement when they are not ambiguous and are themselves a full, contemporary agreement; in finding and computing erroneously so that Riddle is required to pay the same sum twice to Erickson and in refusal to credit Riddle with sums which the court has at the same time determined are for Erickson to pay; and in finding and treating the estimated payment amounts for interim payment purposes as actual amounts due and owing from Riddle to Erickson with regard to both the $90,000 retainage assignment and the 70% net estimate issue.

Discussion of these contentions centers on Findings 11–73, and particularly the Assignment of Receivables and Contemporaneous Agreement (Finding 20) between Erickson and Riddle of December 27, 1968, and the 70 percent net estimate oral agreement and confirmations (Findings 49–50) of September 25, 1969, between Riddle, Erickson, and Dean, all for the benefit of Dean, the matters leading to same, and the breach thereof by Riddle.

The Assignment of Receivables and Contemporaneous Agreement between Erickson and Riddle for the benefit of Dean operated as an independent contract between Riddle and Dean as well as an assignment by Erickson accepted by Dean of Erickson's retainage on the Perry jobs. Its provisions and effect comport with the agreement and contentions and their resolution in *Farmers & Mer. St. Bank v. Snodgrass & Sons Const. Co.*, 209 Kan. 119, 495 P.2d 985, 989 (1972):

"The rationale which Snodgrass asserts as a basis for its position simply is that an assignee does not have greater rights against the debtor than does his assigner. Starting with this premise Snodgrass reasons that since Jayhawk failed to fulfill its obligation under the contract to pay for labor and materials, Snodgrass was entitled to a setoff for those items it paid against any sums due from the retainage account under the subcontract. Appellant then contends that the bank as assignee stands in the shoes of Jayhawk and therefore Snodgrass is not indebted to the bank.

"We cannot accept appellant's rationale. The 'Agreement and Recognition of Assignment of Account' which was signed by Snodgrass and which was relied upon by the bank in making the loan to Jayhawk was more than a simple assignment. We have no hesitancy in holding that by virtue of this instrument Snodgrass agreed to pay the entire retainage to the bank. This instrument constituted an independent contract between Snodgrass and the bank and simply provided additional protection to the bank for the making of the loan by the bank to Jayhawk.

" * * * The 'Agreement and Recognition of Assignment of Account' signed by the contractor Snodgrass clearly obligated Snodgrass to pay the entire amount of the retainage of 10% provided in the subcontract of Jayhawk Service Inc. without a deduction for any setoffs for unpaid obligations of Jayhawk for labor and materials. The evidence is undisputed that the bank relied upon this agreement when it made the loan to Jayhawk.

"Under the facts of this case, the reliance doctrine as applied by the trial judge, is applicable. The Restatement, Contracts, Section 90, succinctly states the doctrine: 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' (p. 110.)

\* \* \* \* \* \*

" \* \* \* Snodgrass may have improvidently entered into this agreement, but having done so it is bound to carry out its obligations thereunder." See also *Sterling Construction Co. v. Humboldt National Bank*, 345 F.2d 994 (10th Cir. 1965).

In such circumstances, Dean was entitled to recover the specified retainage without setoff or reduction. The general rule is stated, 51 A.L.R.2d 882, 912:

"Where the debtor, after knowing of the assignment, had made express promises to the assignee to make future payments on the obligation to him rather than the assignor, he has been held estopped to assert later a pre-existing claim of offset he had against the assignor."

See also *Security State Bank of Great Bend v. Midwest Foundry*, 177 Kan. 151, 277 P.2d 629 (1954); *Ewin Engineering Corp. v. Deposit Guaranty B. & T. Co.*, 216 Miss. 410, 62 So.2d 572 (1953); *Produce Factors Corp. v. United States*, 467 F.2d 1343, 199 Ct.Cl. 572 (1972).

As with the Assignment and Agreement (Finding 20), Riddle's unqualified acceptance of the 70% assignment and promise to pay the specified percent to Dean (Findings 49–50), gave rise to a similar independent contract between Riddle and Dean. *Farmers & Mer. St. Bank v. Snodgrass & Sons Const. Co.*, supra.

Nor is there any windfall to Dean in failure to credit Erickson's notes with the value of the four tractors described in Finding 74. It does not appear on this record that they have been sold, and presumably will be sold for purposes of credit on Erickson's note to Dean at such time as the judgment becomes final. In any event, Riddle did not plead any setoff or counterclaim for credit on this account.

In the instance of both the $90,000 Assignment and the 70 percent Assignment, appellant Riddle's contentions and arguments involve questions of fact. They were resolved by the court on volumes of conflicting evidence, and are not to be disturbed on review, Rule 73.01; and on both the law and the evidence the accounting between Riddle and Dean is for affirmance.

Accordingly, the judgment as against Parker E. Erickson personally is reversed, as is the judgment requiring delivery of equipment to Salina, Kansas, and the judgment awarding Riddle $75,000 for loss of profits. The judgment awarding Riddle $75,000 for loss of use of equipment is reversed and remanded for entry of a new judgment for Riddle for $16,320 for loss of use of equipment. The judgment is, in all other respects, affirmed; and the cause is remanded for entry of a new judgment as indicated.

All concur.